UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION
CIVIL ACTION NO.

| | |
|---|---|
| BEREAN BAPTIST CHURCH, RETURN AMERICA, INC., DR. RONNIE BAITY, and PEOPLE'S BAPTIST CHURCH, INC., <br><br>Plaintiffs, <br><br>v. <br><br>GOVERNOR ROY COOPER, in his official capacity, <br><br>Defendant, | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Pursuant to Local Rule 7.2, Plaintiffs Berean Baptist Church ( "Berean"), a North Carolina nonprofit corporation; Return America, Inc. ("Return America"), a North Carolina nonprofit corporation; Dr. Ronnie Baity ("Dr. Baity"); and People's Baptist Church, Inc. ("People's"), a North Carolina nonprofit corporation, respectfully submit this Memorandum in support of their Motion for Temporary Restraining Order, and allege as follows:

Plaintiffs re-allege and incorporate as if fully set out herein all allegations set forth in the Complaint for Declaratory Judgement and Injunctive Relief filed in this matter, particularly the paragraphs detailing the facts of the case and the terms and interpretations of Defendant's COVID-19 Executive Orders as they apply to the religious gathering of Plaintiffs.

The current COVID-19 pandemic has raised a myriad of unanswerable questions and posed many unresolvable problems for the world, including North Carolina. Plaintiffs understand that their state officials have been faced with a series of crises that are unprecedented in the nation and certainly in their administration. Plaintiffs are also cognizant that the leaders have had to make many difficult decisions and make them quickly to meet the life-threatening challenges facing the state.

Unfortunately, the executive orders that have been issued to try to meet the COVID-19 crisis have infringed and they continue to infringe upon First Amendment rights long held sacred in this nation. Since March, these Plaintiffs have been unable to assemble more than 10 people for religious worship. "Safety" measures that were to be "temporary" have been extended and extended and extended and become more and more restrictive on gatherings for religious worship. And now, although they may worship in groups of more than 10, they are forced to do so outdoors unless it is "impossible" to gather indoors.

Plaintiffs are now compelled to challenge the Governor's executive orders that impact their religious gatherings because of the ongoing and glaring disparate, unequal, discriminatory, unfavored, hostile, and most restrictive of treatment of Plaintiffs' religious and other First Amendment gatherings over other, secular, gatherings. Plaintiffs' congregants need comfort from their Church after they have been forced to remain in their homes for weeks and weeks. Plaintiffs have serious concerns about the ever-lengthening infringement by the Orders upon their God-commanded duty to corporately assemble for worship in their houses of worship and about the State's interference into the very very

2

religious beliefs as well as the form and method of the most important of their ecclesiastical functions—religious worship.

This case sets before this Court the fortunately rare[1] question of whether a church and other religious entities, wanting to honor their sincerely-held religious beliefs by continuing to assemble for religious worship indoors with more than 10 people while adhering to all recommended COVID-19 social distancing and personal hygiene safety guidelines, may be denied their religious and assembly rights, under penalty of criminal sanctions, by a state government that has disparately exempted dozens of other non-protected secular organizations from the same treatment. Plaintiffs seek temporary and permanent injunctive relief to be able to assemble for religious worship in their God-given buildings, especially during the current crisis.

**Requirements for a Temporary Restraining Order**

1. Under federal law, a court faced with a request to issue preliminary injunctive relief must consider four factors: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest." *Safety-Kleen, Inc. v. Wyche,* 274 F.3d 846, 858-59 (4th Cir. 2001).

---

[1] "The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions." *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 523 (1993)

2. The court in *Safety-Kleen* goes on to instruct that the court should first examine the issue of irreparable harm, then consider the balance of harm between Plaintiff and Defendant, and then the issue of success on the merits. *Id.*

**There is a substantial risk of irreparable harm to the Plaintiff.**

3. The United States Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).

4. This United States District Court for the District of Massachusetts earlier this month noted that "a finding of a First Amendment violation obviates the need for an additional showing of irreparable harm. *See Sindicato Puertorriqueño de Trabajadores*, 699 F.3d at 10-11." *ACA Int'l v. Healey*, No. 20-10767-RGS, 2020 U.S. Dist. LEXIS 79716, at *25 (D. Mass. May 6, 2020).

5. Plaintiffs' constitutional rights to worship and assemble in the manner commanded by their faith have already been violated by the Defendant and will continue to be violated absent this Court's immediate action.

**There is no similar risk of irreparable harm to Defendant.**

6. The Defendant has exempted dozens of other types of gatherings from the restrictive "only outdoors if you have more than 10 people" rule – essentially every "exempt" entity **except** places of worship and the ability to exercise one's First Amendment rights, are free to carry out their duties and activities indoors in groups of more

than 10. Permitting churches to meet indoors with more than 10 people during this litigation will not injure or harm the Defendant in any way.

7. The State remains free to enact permissible and reasonable regulations for the health and safety of those gathering for church services and other First Amendment activities, just as it has been already doing for other, secular, gatherings of more than 10 since the COVID-19 crisis began, thus more narrowly tailoring the State's requirements to satisfy social distancing and safety guidelines.

**Plaintiffs have a strong likelihood of success on the merits.**

8. Once a plaintiff can show irreparable harm and that the harm balance tips in his favor, then the court <u>must</u> grant a preliminary injunction as long as the plaintiff "has raised questions going to the merits so serious, substantial, difficult and doubtful, **as to make them fair ground for litigation** and thus for more deliberate investigation." *Id.* (quoting *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir. 1991)) (emphasis added).

9. Plaintiffs will show in this memorandum that Defendant's flagrant violations of Plaintiffs' constitutional rights clearly present a question to this Court so serious and substantial that they are fair grounds for litigation.

10. Gov. Cooper's Executive Order Nos. 117, 120, 121, 135, and 138 (hereby "the Orders"), as well as the "EO 138 Phase One -- Guidance for Religious Services and Mass Gathering Restrictions" issued by the Governor's office to "assist congregants and public officials about "how religious worship services may be safely convened," whether

facially or as applied, violate the First Amendment rights of Plaintiffs set forth in the Free Exercise, Establishment, and Assembly Clauses.

11. The Governor's Guidance further interprets EO 138 to mean that churches may only assemble more than 10 people if they meet outdoors or indoors if it is "impossible" to meet outdoors, **such as when "particular religious beliefs dictate that some or all of a religious service must be held indoors and that more than ten persons must be in attendance**," making the right to gather inside for religious worship **dependent upon the religious beliefs of the gathering participant**, not upon age, or health, or criminal background, or weight, but on holding an approved religious belief; if the participant does not hold the State's established religious belief, he must gather for worship outside or inside with nine people or less.

12. The First Amendment guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise [of religion]…or the right of the people peaceably to assemble…" U.S. Const. amend I.

13. 42 U.S.C. § 1983 protects citizens from deprivations of their federal right by a person acting under color of state law. *Doucette v. Georgetown Pub. Sch.*, 936 F.3d 16, 23 (1st Cir. 2019).

14. The First Amendment of the United States Constitution applies to North Carolina by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000).

15. The Governor's Orders specifically and expressly restricts "gatherings…for worship, or exercise of First Amendment rights" from any sort of in-person religious assembly of more than 10 people unless the gathering takes place outdoors.

16. It is clear that any law that burdens a religious practice must be neutral and of general applicability, and that "[a] law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi* at 528.

**The Executive Orders are not neutral or of general applicability.**

17. The United States Supreme Court has ruled that "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* at 527.

18. The Orders are not facially neutral because, while the Orders indeed subject a few other gatherings to similar treatment (limiting gatherings to only outdoors or indoors with no more than 10 people), the Orders go on to exempt essentially everything else <u>other</u> than places of worship.

19. Beyond the dozens of outright exemptions already available for all "essential" entities, the Executive Order also quietly exempts the other gatherings seemingly limited to outside – "look[ing] for and obtain[ing] good and services, for work…or for receiving governmental services" cannot feasibly take place outdoors (qualifying for the "unless impossible" exception to the outdoors rule). Some of these exemptions will allow substantially more than 10 people to gather together in a single building.

20. The Orders offer no support or reasoning for why only places of worship and other First Amendment activity should be constrained to take place only outside (versus the dozens of other indoor exceptions) or inside if they have no more than 10 people.

21. Plaintiffs respectfully submit that gatherings expressly protected by the U. S. and North Carolina Constitutions should be at the top of the government's list of gatherings qualifying for the most-protected treatment.

22. The Supreme Court of the United States specifically addresses government action that burdens the exercise of religion by an optional process of "exempting" numerous similar secular activities: when "individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of "religious hardship" without compelling reason.'" *Id.* at 537, (*quoting Bowen* v. *Roy*, 476 U.S. [693] at 708[, 90 L.Ed.2d 735, 106 S.Ct. 2147 (1986) (opinion of Burger, C. J.).

23. Within the last week, the Sixth Circuit Court of Appeals had occasion to enjoin the Kentucky governor from enforcing another, similar, COVID-19 Executive Order that included 4 pages of exceptions that were treated more favorably than churches.

> As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law. *Ward* [*v. Polite*], 667 F.3d [727] at 738 [(6th Cir. 2012)]. "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 740.

*Roberts v. Neace*, No. 20-5465, 2020 U.S. App. LEXIS 14933, at *8 (6th Cir. May 9, 2020).

24. The Supreme Court is very firm on the illegality of deeming secular practices "essential" over religious practices: **"[The government's] application of the ordinance's**

**test of necessity devalues religious reasons…by judging them to be of lesser import than nonreligious reasons. Thus, religious practice is being singled out for discriminatory treatment.**" *Id.*, emphasis added.

25. The Executive Order does not argue or even attempt to explain how a gathering indoors at a church would pose any different health risks that those than would arise in airports, airplanes, legal offices, warehouses, or any of the other exempted "essential" activities.

26. Any health and safety concerns present at a safely conducted indoor religious service would logically be present at all other exempted indoor activities. That same lack of logic on how exempt businesses would pose less of a health risk than would church gatherings was extremely troubling to the Sixth Circuit's consideration of the executive order it was considering.

> But the orders do not permit soul-sustaining group services of faith organizations, even if the groups adhere to all the public health guidelines required of the other services.
>
> Keep in mind that the Church and its congregants just want to be treated equally. They don't seek to insulate themselves from the Commonwealth's general public health guidelines. They simply wish to incorporate them into their worship services. They are willing to practice social distancing. They are willing to follow any hygiene requirements. They do not ask to share a chalice. The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same.
>
> Come to think of it, aren't the two groups of people often the *same people*— going to work on one day and going to worship on another? How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation, or at least the Governor has not provided one.

*Roberts v. Neace*, No. 20-5465, 2020 U.S. App. LEXIS 14933, at *8-9 (6th Cir. May 9, 2020) (emphasis in original). Governor Cooper's Orders' logic for treating churches less favorably than many secular groups also defies explanation.

27. As such, it is absolutely clear that the North Carolina government has arbitrarily judged the religious reasons of Plaintiffa to assemble to be of "lesser import" than the dozens upon dozens of secular reasons the government has freely chosen to allow to continue gathering indoors.

28. This behavior has been explicitly condemned by the Supreme Court in *Lukumi* and by the Sixth Circuit in *Roberts, supra,* which may be taken as persuasive authority on the issue.

**Standard of Review**

29. Unsurprisingly, there is no direct authority on the issue of a state government outright prohibiting the assembly of more than 10 people indoors for religious services without any hearing. Indeed, the drafters of the First Amendment and the North Carolina Constitution likely would have never considered such a circumstance possible.

30. The Court in *Lukumi* set forth this standard: "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Id.* at 546.

31. As set forth above, the incredibly broad swath of arbitrary exemptions allowed by Defendant in this case while explicitly naming religious organizations as limited to outdoors clearly show that the Orders are not entirely neutral or of general

application – there was undeniable governmental discretion used in determining what activities and how many people should be allowed indoors.

32. As such, Plaintiffs assert that this action is subject to strict scrutiny.

## The Executive Orders fail strict scrutiny

33. In order to satisfy strict scrutiny, a law restrictive of religious practice must not just advance a compelling governmental interest, but "must be narrowly tailored in pursuit of those interests." *Id.* at 531.

34. Plaintiff does not dispute that keeping the public safe during a pandemic such as COVID-19 is a compelling government interest. Indeed, it is one of the highest order. Plaintiffs do, however dispute that the Orders at issue in fact advance that interest or that they are sufficiently narrowly tailored to satisfy strict scrutiny.

35. When "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree," the law is not narrowly tailored or the least restrictive means. *Id.* at 546.

36. Again, the Orders offer no evidence as to why churches could not be held subject to the same requirements to which all other indoor exempted gatherings must adhere.

37. Any evidence offered by Defendant must offer more to this court than "plausible hypotheses" (*Contractors Ass'n of E. Pa. v. City of Phila.* 6 F.3d 990, 1008 (3d Cir. 1993) or "ambiguous proof" (*Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786, 800 (2011)).

38. This pandemic and the effects of it on our communities are so unprecedented that it would be nigh impossible for the Defendant to offer any substantive evidence on this matter that surpasses mere hypotheses or ambiguous proof.

39. The argument that Defendant's stance is no more than "ambiguous proof" is bolstered by the fact that there are at least fifteen other states which deliberately allowed places of worship to meet indoors in their respective Executive Orders and did not ban religious assembly whatsoever.[2]

40. The Supreme Court is clear – this court must look "**beyond broadly formulated interests justifying the general applicability of government mandates and [scrutinize] the asserted harm of granting specific exemptions to particular religious claimants**." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006), emphasis added.

41. The Supreme Court in *Gonzalez* went on to note that the State needed "to show with more particularity how its admittedly strong interest . . . would be adversely affected by granting an exemption to the [Plaintiff]." *Id.* citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

42. The Supreme Court's *Gonzalez* decision requires Defendant to prove how allowing Plaintiffs to continue exercising its religious rights indoors would "adversely affect" the government's compelling interest any more than every single exemption

---

[2] "Roughly a third of states (15) are allowing religious gatherings to continue without any limit on their size." Virginia Valla, *Most states have religious exemptions to COVID-19 social distancing rules*, Pew Research Center, April 27, 2020, https://pewrsr.ch/3bHDndx.

Defendant has already allowed (including allowing hundreds of people inside simultaneously at a single store, airplane, or medical facility).

43. Indeed, as set forth in the Complaint, Plaintiffs' church services have been complying with social distancing and adherence to CDC recommendations. They pose no unique risk not posed by any of the mass gatherings allowed indoors in the Orders.

44. It is for all these reasons that Plaintiffs strongly assert that they have a reasonable likelihood of success on the merits.

### Granting Plaintiff's request would promote the public interest.

45. The law is quite clear on the favoring of constitutional freedoms: "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd' sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (quotations omitted).

### Conclusion

Plaintiffs Berean Baptist Church, Return America, Inc., Dr. Ronnie Baity, and People's Baptist Church, Inc., respectfully ask the Court grant their Motion for a Temporary Restraining Order, allowing them to conduct in-person, indoor church services for more than 10 people while practicing adequate social distancing and following all relevant safety guidelines.

WHEREFORE, Plaintiffs respectfully ask the Court to grant the Motion and issue its requested relief and such other relief as it deems necessary.

(Date and signature block on next page).

Date:  May 14, 2020

        Respectfully submitted,

        BEREAN BAPTIST CHURCH
        RETURN AMERICA, INC.
        DR. RONNIE BAITY
        PEOPLE'S BAPTIST CHURCH, INC.

        By their attorneys,

        s/ *Deborah J. Dewart*
        Deborah J. Dewart
        N.C. Bar No. 30602
        620 E. Sabiston Drive
        Swansboro, North Carolina 28584-9674
        Telephone: (910) 326-4554
        debcpa@earthlink.net


        s/ *David C. Gibbs, Jr.*
        David C. Gibbs, Jr.*
        Seth J. Kraus*
        Jonathan D. Gibbs*
        GIBBS & ASSOCIATES LAW FIRM, LLC
        6398 Thornberry Ct.
        Mason, Ohio 45040
        Telephone: (513) 234-5545
        dgibbsjr@gibbs-lawfirm.com
        skraus@gibbs-lawfirm.com
        jgibbs@gibbs-lawfirm.com
        *To appear pursuant to Local Rule 83.1*

        *Counsel for Plaintiffs*

**CERTIFICATION OF WORD COUNT AND COMPLIANCE**

Pursuant to Local Rule 7.2(f), on this May 14, 2020, the undersigned hereby certifies that this Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order contains 3,215 words, excluding the parts of the memorandum exempted from the word count by the Rule.

s/ *Seth J. Kraus*
Seth J. Kraus*
GIBBS & ASSOCIATES LAW FIRM, LLC
6398 Thornberry Ct.
Mason, Ohio 45040
Telephone: (513) 234-5545
skraus@gibbs-lawfirm.com
*To appear pursuant to Local Rule 83.1*
