IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:20-CV-81-D

BEREAN BAPTIST CHURCH,                    )
RETURN AMERICA, INC.,                     )
DR. RONNIE BAITY, and                     )
PEOPLE'S BAPTIST CHURCH, INC.,            )
                                          )
                        Plaintiffs,       )
                                          )
            v.                            )            ORDER
                                          )
GOVERNOR ROY A. COOPER, III,              )
in his official capacity,                 )
                                          )
                        Defendant.        )

On May 14, 2020, Berean Baptist Church ("Berean"), Return America, Inc. ("Return

America"), Dr. Ronnie Baity ("Dr. Baity"), and People's Baptist Church, Inc. ("People's";

collectively, "plaintiffs") filed a verified complaint seeking injunctive relief for the violation of their

First Amendment rights [D.E. 1] and requested an emergency temporary restraining order [D.E. 2].

Specifically, plaintiffs contend that Governor Roy Cooper's ("Governor Cooper" or "the Governor")

Executive Order 138 concerning COVID-19 and a general requirement that all worship services

involving more than 10 people must be held "outdoors unless impossible" to hold outdoors violates

the Free Exercise Clause of the First Amendment. [D.E. 1-6] 11 (emphasis added). As part of their

challenge, plaintiffs note that Governor Cooper's Director of Legislative Affairs issued "Guidance

for Religious Services and Mass Gathering Restrictions." That Guidance stated:

> In situations where it is not possible to conduct worship services outdoors or through
> other accommodations—such as through, for example a series of indoor services of
> ten or fewer attendees or through on-line services—the ten-person attendance limit
> on indoor worship services does not apply. For example, there may be situations

> where particular religious beliefs <u>dictate</u> that some or all of a religious service <u>must</u> be held indoors and that more than ten persons <u>must</u> be in attendance.

[D.E. 1-7] 3–4 (emphasis added). They also note that Governor Cooper's Executive Order 138 permits countless non-religious gatherings to take place inside without limiting such gatherings to 10 people and without requiring those attending such gatherings to, in essence, be prepared to prove under penalty of criminal prosecution that it "is impossible" to gather outside. Essentially, plaintiffs contend that the assembly for religious worship provisions in Governor Cooper's Executive Order 138 violate the Free Exercise Clause of the First Amendment by not treating religious entities and individuals equally when compared to countless non-religious entities and individuals.

On May 15, 2020, the court held a hearing. Solicitor General Ryan Park appeared on behalf of Governor Cooper and submitted a declaration from Dr. Elizabeth Tilson, the Chief Medical Officer for the North Carolina Department of Health and Human Services. See [D.E. 17].

There is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment. Plaintiffs have demonstrated that they are likely to succeed on the merits of their Free Exercise claim concerning the assembly for religious worship provisions in Executive Order 138, that they will suffer irreparable harm absent a temporary restraining order, that the equities tip in their favor, and that a temporary restraining order is in the public interest. Thus, having considered the entire record and governing law, the court grants plaintiffs' motion for a temporary restraining order.

## I.

### A.

For purposes of this temporary restraining order only, the court draws the facts largely from plaintiffs' verified complaint. On March 10, 2020, the Governor responded to COVID-19 with

2

Executive Order No. 116 ("EO 116") by declaring a State of Emergency for North Carolina and thereafter issuing a series of executive orders attempting to prevent the spread of COVID-19 within North Carolina. Roy Cooper, in his official capacity as Governor of the State of North Carolina, is responsible for enacting and enforcing the COVID-19 executive orders at issue in this case and is sued in his official capacity only.

In their complaint, plaintiffs challenge the Governor's Executive Order Nos. 117, 120, 121, 135, and 138 issued March 14, March 27, March 23, April 23, and May 5, 2020, respectively ("EO 117," "EO 120," "EO 121," "EO 135," "EO 138," and collectively "Orders"), as being unconstitutional both facially and as applied to plaintiffs, because the orders treat religious gatherings less favorably than similar non-religious gatherings. According to plaintiffs, the Orders virtually ban religious assembly, are not narrowly tailored, and do not permit less restrictive means to achieve the government's interest without burdening plaintiffs' First Amendment rights. See [D.E. 1-2, 1-3, 1-4, 1-5, 1-6]. According to plaintiffs, the Orders are not neutral laws of general applicability because they target constitutionally protected activity, significantly burden plaintiffs' right to freedom of religion and assembly, and establish an orthodox form of religious exercise approved by the State, all the while providing broad exemptions for many other non-religious gatherings of more than 10 people.

Plaintiff Berean is a non-profit church incorporated under the laws of North Carolina and organized exclusively for religious purposes under section 501(c)(3) of the Internal Revenue Code. Berean is located in Winston Salem, North Carolina.

Plaintiff Return America is a non-profit corporation incorporated under the laws of North Carolina and organized for religious and educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code. Return America is located in Winston Salem, North

3

Carolina.

Berean has been operating in Winston-Salem, North Carolina, since November 1980. Multiple times every week, for almost 40 years, Berean has assembled its members and attendees in its church buildings in gatherings of more than 10 people to engage in religious worship as a body. It has been unable to do so since the Governor issued his Orders.

Dr. Baity is the founder and Pastor of Berean, the President of Return America, and serves as a chaplain for the Winston-Salem Police Department. Berean and its members, including Dr. Baity, who together make up Berean, believe that a physical assembly in one place on Sunday, for mid-week services, in revivals, and for other special meetings is a God-commanded part of their worship and that the failure to assemble violates their religious faith. Church attendance is of such ecclesiastical importance to Berean that under the Berean's bylaws, the failure of a member to attend at least one regular worship service in two months subjects that member's membership to automatic termination by Berean.

Return America is a non-profit organization that consists of a network of churches and individuals whose purpose it is to educate, motivate, and mobilize citizens in a united effort to promote Judeo-Christian values. Return America regularly conducts rallies, conferences, and other gatherings with more than 10 people. Return America has been prohibited from doing since the Governor issued his Orders. Return America has over 130 supporting North Carolina churches and several hundred individuals within its network, with some 12,000 individuals attending Return America rallies.

People's is a non-profit church incorporated under the laws of North Carolina and organized exclusively for religious purposes under section 501(c)(3) of the Internal Revenue Code. People's is located in Greenville, North Carolina. People's has been operating in Greenville, North Carolina

4

for 58 years. Multiple times every week over those 58 years, People's has assembled its members and attendees in its church buildings in gatherings of more than 10 people to engage in religious worship as a body. It has been unable to do so since the Governor issued his Orders. People's and its members believe that a physical assembly in one place on Sunday, for mid-week services, in revivals, and for other special meetings is a God-commanded part of their worship and that the failure to assemble violates their religious faith. Church attendance is of ecclesiastical importance to People's. Under the People's bylaws, a qualification for membership is being engaged in regular church attendance. If a member fails to attend for six months, the member may automatically be placed on the inactive list.

According to plaintiffs, they have peaceably complied with the Orders that have limited their religious worship gatherings to 10 people or forced them to hold much less acceptable electronic meetings. They have done so in furtherance of their strong interest in protecting their congregants, respect for and obedience to authority, and assurances from the Governor that the restrictive measures imposed by the Orders would be very temporary. Plaintiffs now challenge the Orders due to the

> disparate, unequal, discriminatory, unfavored, hostile, and most restrictive treatment of Plaintiffs' religious and other First Amendment gatherings over other, secular, gatherings; their congregants need comfort from their church after they have been forced to remain in their homes for weeks and weeks; the ever-lengthening infringement by the Orders upon their God-commanded duty to corporately assemble for worship in their houses of worship; and their concern over the State's interference in the very form and method of their most important of their ecclesiastical functions—religious worship.

Compl. [D.E. 1] ¶ 30.

## B.

On March 10, 2020, the Governor issued EO 116, declaring a State of Emergency, as defined

5

in N.C. Gen. Stat. §§ 166A-19.3(6) and 166A-19.3(19) for North Carolina based on the public health emergency posed by COVID-19. See [D.E. 1-1] 3. North Carolina remains under the State of Emergency. See [D.E. 1-6] 1–4.

On March 14, 2020, the Governor issued EO 117 prohibiting for 30 days "mass gatherings" of "more than 100 people in a single room or single space at the same time, such as an auditorium, stadium, arena, large conference room, meeting hall, theater, or any other confined indoor or outdoor space." [D.E. 1-2] 3. EO 117 exempted from the mass gathering prohibition numerous categories of gatherings, including "normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where more than one hundred (100) persons are gathered. It also does not include office environments, restaurants, factories, grocery stores or other retail establishments." Id. EO 117 authorized criminal prosecution of violations of EO 117 as Class 2 misdemeanors. See id.

The Governor issued EO 120 on March 23, 2020, to be in effect for 30 days. EO 120 reduced the maximum number to 50 persons who could lawfully gather in a mass gathering and again excluded from the definition of mass gathering "normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers," as well as "office environments, factories, grocery stores, and child care facilities." [D.E. 1-3] 4. EO 120 also closed entertainment facilities and personal care and grooming facilities, and again authorized the criminal prosecution of violations. Id.

The Governor issued EO 121 on March 27, 2020, and ordered all individuals in North Carolina to stay at home and practice social distancing as much as reasonably possible, and permitted individuals to leave their homes "only for Essential Activities, Essential Governmental operations, or to participate in or access COVID-19 Essential Business and Operations" as defined in EO 121.

6

[D.E. 1-4] 4. Section 2 of EO 121 listed 30 "COVID-19 Essential Businesses and Operations." Id. at 5–9. The first category of EO 121's list of COVID-19 Essential Business or Operation was "Businesses that meet Social Distancing Requirements," which had no limit placed on the number of employees and customers allowed to gather except at the point of sale or purchase. Id. at 5–6. The Governor also included as an essential business or operation:

> 10. Religious entities. Religious facilities, entities, groups, gatherings, including funerals. Also, services, counseling, pastoral care, and other activities provided by religious organizations to the members of their faith community. All of these functions are subject to the limitations on events or convenings in Section 3 of this Executive Order.

Id. at 7 (emphasis added). The Governor included "Religious entities" as one of only two categories of the 30 Essential Businesses and Operations that were subject to EO 121's Section 3 requirements. Id. The other one was "Funeral Services." Id. at 9.

Section 3 of EO 121 rescinded the definitions from earlier Orders that had defined "mass gatherings" as more than 100 people and then more than 50 people. It defined "mass gathering" as "any event or convening that brings together more than ten (10) persons in a single room or single space at the same time." Id. at 10. It excluded from the 10-person limit "normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers" or any "COVID-19 Essential Business or Operation." Id. Section 3 capped funeral services at 50 people, and religious gatherings at 10 people. See id. at 9–10.

On April 23, 2020, the Governor issued EO 135, extending the mass gathering prohibition of EO 120 and all of EO 121 until May 8, 2020. See [D.E. 1-5] 3–4.

On May 5, 2020, the Governor issued EO 138 in which he began lifting the stay at home order by permitting individuals to leave their homes beginning May 8, 2020, only for "Allowable Activities" as the Governor defined. [D.E. 1-6] 4. Otherwise, the Governor ordered individuals to

**7**

continue to stay at home. See id. at 5. EO 138's allowable activities include "[t]o worship or exercise First Amendment rights." Id. at 6.

EO 138's definition of "mass gathering" now excludes "gatherings for . . . worship, or exercise of First Amendment rights," which would appear to exclude gathering for worship from the 10-person limit in "any other confined indoor or outdoor space" required of a "mass gathering." Id. at 12. However, EO 138 then requires gatherings with more than 10 people to "take place outdoors unless impossible." Id. (emphasis added).

In EO 138, the Governor still considers funeral services a "mass gathering," but the Governor permits up to 50 people to gather for a funeral service. Id. In EO 138, the Governor also excluded from the definition of "mass gathering" events in which "the participants all stay within their cars, such as at a drive-in movie theater." Id.

On May 11, 2020, Lee Lilley, the Director of Legislative Affairs for the Office of Governor Cooper, notified North Carolina Senators that the Governor's office "has issued guidance to assist congregants and public officials regarding" "how religious worship services may be safely convened." [D.E. 1-7] 2 (Letter from the Office of the Governor to Senators with attached "EO 138 Phase One -- Guidance for Religious Services and Mass Gathering Restrictions" ("Guidance")). According to the Guidance, EO 138 applies to religious services. See id. at 3–4. In addition, "[i]ndoor worship services and weddings are allowed for gatherings of ten people or fewer in the same confined space." Id. at 4. The Guidance also interprets EO 138 to mean that, as a general rule, religious entities may only assemble with more than 10 people if they meet outdoors. Id. The Guidance then states that the 10-person indoor attendance limit does not apply if it is "not possible" to meet outdoors. Id. The Guidance then gives an example of impossibility to include when "particular religious beliefs dictate that some or all of a religious service must be held indoors and

8

that more than ten persons must be in attendance." Id.

According to plaintiffs, EO 138 has made the right to gather inside for religious worship dependent upon the religious beliefs of the gathering participant, not upon the participant's age, health, or background. Thus, according to plaintiffs, under pain of criminal prosecution, if the participant does not hold the State's established religious belief or is not prepared to prove "impossibility," the participant must gather for worship outside when worshiping with more than 10 people. Compl. at ¶ 52.

Plaintiffs assert three claims. In count one, plaintiffs contend that the Orders, on their face or as applied, violate their Free Exercise rights under the First and Fourteenth Amendments. See id. ¶¶ 56–61. In count two, plaintiffs contend that the Orders, on their face or as applied, violate the Establishment Clause under the First and Fourteenth Amendments. See id. ¶¶ 63–65. In count three, plaintiffs contend that the Orders, on their face or as applied, violate their right to assemble under the First and Fourteenth Amendments. See id. ¶¶ 66–70. Plaintiffs seek declaratory and injunctive relief.

## II.

The court has considered plaintiffs' request for a temporary restraining order under the governing standard. See, e.g., Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Centro Tepeyac v. Montgomery Cty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc); Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reissued in relevant part, 607 F.3d 355 (4th Cir. 2010) (per curiam); U.S. Dep't of Labor v. Wolf Run Mining Co., 452 F.3d 275, 281 n.1 (4th Cir. 2006) (substantive standard for temporary restraining order is same as that for entering a preliminary injunction). Plaintiffs have established that (1) they are likely to succeed on the merits of their claim that the assembly for religious worship

9

provisions in EO 138 violate their rights under the Free Exercise Clause of the First Amendment;
(2) they are likely to suffer irreparable harm absent a temporary restraining order; (3) the balance of
the equities tips in their favor; and (4) a temporary restraining order is in the public interest.

## III.

## A.

Plaintiffs have demonstrated a likelihood of success on their claim that the assembly for
religious worship provisions in EO 138 and the Guidance violate their rights under the Free Exercise
Clause of the First Amendment. The First Amendment provides that "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend.
I. "[A] law that is neutral and of general applicability need not be justified by a compelling
governmental interest even if the law has the incidental effect of burdening a particular religious
practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); see
Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2019 (2017); Emp't Div.,
Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 878–89 (1990). "Neutrality and general
applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the
other has not been satisfied." Lukumi, 508 U.S. at 531. If a law is not neutral or generally
applicable, it "must be justified by a compelling governmental interest and must be narrowly tailored
to advance that interest." Id. at 531–32; see Jesus Christ Is The Answer Ministries, Inc. v. Baltimore
Cty., 915 F.3d 256, 265–66 (4th Cir. 2019); Am. Life League, Inc. v. Reno, 47 F.3d 642, 654 (4th
Cir. 1995).

No constitutional right—including the right of free exercise of religion—is absolute. See
Jacobson v. Massachusetts, 197 U.S. 11, 26 (1905) ("But the liberty secured by the Constitution of
the United States to every person within its jurisdiction does not import an absolute right in each

person to be, at all times and in all circumstances, wholly freed from restraint."). Individual liberties, "under the pressure of great dangers," may be reasonably restricted "as the safety of the general public may demand." Id. at 29. A court may review those restrictions if they have "no real or substantial relation to those objects, or [are], beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Id. at 31. Although 115 years old, Jacobson remains the lodestar in striking the balance between constitutional rights and public safety. See In re Abbott, 954 F.3d 772, 783 (5th Cir. 2020); Roberts v. Neace, — F.3d —, No. 20-5465, 2020 WL 2316679, at *4 (6th Cir. May 9, 2020); Maryville Baptist Church, Inc. v. Beshear, — F.3d —, 2020 WL 2111316, at *4 (6th Cir. May 2, 2020); see also Kansas v. Hendricks, 521 U.S. 346, 356–57 (1997).

Section 6(A) of EO 138 provides:

Section 6. Mass Gatherings Prohibited.

A. Prohibition. Mass Gatherings are prohibited. "'Mass Gathering" means an event or convening that brings together more than ten (10) persons at the same time in a single space, such as an auditorium, stadium, arena, conference room, meeting hall, or any other confined indoor or outdoor space. This includes parades, fairs, and festivals.

Mass Gatherings do not include gatherings for health and safety, to look for and obtain goods and services, for work, for worship, or exercise of First Amendment rights, or for receiving governmental services. A Mass Gathering does not include normal operations at airports, bus and train stations or stops, medical facilities, shopping malls, and shopping centers. However, in these settings, people must follow the Recommendations to Promote Social Distancing and Reduce Transmission as much as possible, and they should circulate within the space so that there is no sustained contact between people.

[D.E. 1-6] 12. So far so good. If you read just this paragraph it appears that the definition of "Mass Gatherings" does not include gatherings "for worship, or exercise of First Amendment rights." Id. Thus, it appears plaintiffs can meet and worship with as many members as they want whether inside or outside.

11

Not so. Upon close inspection, the protections in section 6(A) are nominal at best. See Lukumi, 508 U.S. at 534 ("Facial neutrality is not determinative."). Indeed, the assembly for religious worship provisions in EO 138 represent precisely the sort of "subtle departures from neutrality" that the Free Exercise Clause is designed to prevent. Gillette v. United States, 401 U.S. 437, 452 (1971); see Lukumi, 508 U.S. at 534. At oral argument, the court asked the Governor's counsel if EO 138 "means that any religious entity can hold an indoor service at any time of any size if it wants to, so long as it follows social distancing?" The Governor's counsel answered, "No." The Governor's counsel then discussed section 6(C) in EO 138.

Section 6(C) states: "Because the risk of COVID-19 spread is much greater in an indoor setting, any gatherings of more than ten (10) people that are allowed under Subsection 6(A) shall take place outdoors unless impossible." [D.E. 1-6] 12 (emphasis added). The court then asked, who decides whether it is "impossible" to worship outside under section 6(C). The Governor's counsel conceded that it would be a sheriff or other local law enforcement officer who would decide whether the religious entity or individual was correct in deciding whether it was "impossible" to worship outside.

That's a remarkable answer in light of the Free Exercise Clause. See Masterpiece Cakeshop, LLC v. Colorado Civil Rights Comm'n, 138 S. Ct. 1719, 1723–32 (2018); Sherbert v. Verner, 374 U.S. 398, 401–410 (1963), abrogated in part by Smith, 494 U.S. at 882–83; Cantwell v. Connecticut, 310 U.S. 296, 305–311 (1940). A leader of a religious entity or a worshiper, under pain of criminal prosecution for a Class 2 misdemeanor, has to answer to a sheriff or other local law enforcement officer whether it is "impossible" to worship outside. Who could answer that question, "Yes. It is impossible."? After all, in the overwhelming majority of cases, members of a religious entity would have gathered to worship from somewhere else. Upon arrival at the worship site, all would be

12

outside for at least a few moments, whether they traveled by public transportation, by automobile, by bus, or by foot. Sure, it might be hot, cold, rainy, or buggy, but when would it be "impossible" to worship outside? EO 138 does not answer the question, but the Governor's "Guidance" does. And that answer is even less satisfying.

In the Guidance, the Governor's Director of Legislative Affairs gave an example of what would qualify to permit a religious organization or group of worshipers to have more than 10 people inside to worship. See [D.E. 1-7] 4. The Guidance states: "For example, there may be situations in which particular religious beliefs dictate that some or all of a religious service must be held indoors and that more than ten persons must be in attendance." Id. (emphasis added).

Again, the question becomes: who decides whether a religious organization or group of worshipers correctly determined that their religious beliefs dictated the need to have more than 10 people inside to worship? Under EO 138, the answer is a sheriff or another local law enforcement official. This court has grave concerns about how that answer comports with the Free Exercise Clause. See Masterpiece Cakeshop, LLC, 138 S. Ct. at 1723–32; Sherbert, 374 U.S. at 401–10; Cantwell, 310 U.S. at 305–11.

At the hearing, we also discussed what the "impossibility" provision in section 6(C) meant for the myriad non-religious entities referenced in EO 138. The Governor's counsel opined that because it would be "impossible" to move the produce out of a grocery store, grocery stores and those who shop there are not subject to the "no-more-than-10-inside-unless-impossible" requirement in section 6(C). Presumably, that answer would be the same for those who operate or gather and wait at an airport, bus, or train terminal, a medical facility, a shopping mall, a shopping center, Wal-Mart, Lowes, and countless other businesses of all kinds. If a person or entity is buying or selling goods or services, the Governor understands EO 138 to mean it is "impossible" to move such goods

13

or services outside. Thus, the "no-more-than-10-inside-unless-impossible" requirement in section 6(C) does not apply to vast swaths of individuals and businesses. Rather, all such individuals and businesses must do to comply with section 6(A) of EO 138 is to ensure that people "follow the Recommendations to Promote Social Distancing and Reduce Transmissions as much as possible, and they circulate within the space so that there is no sustained contact between people." [D.E. 1-6] 12.

Not so for religious entities or worshipers. As the Governor's counsel made clear at the hearing, and as the Guidance makes even more clear, a sheriff or other law enforcement official has the power to decide whether a religious person or entity has met the "no-more-than-10-inside-unless-impossible" requirement in section 6(C). If the answer is wrong, the religious person or entity faces prosecution for a Class 2 misdemeanor. Id. at 15.

These glaring inconsistencies between the treatment of religious entities and individuals and non-religious entities and individuals take EO 138 outside the "safe harbor for generally applicable laws." Roberts, 2020 WL 2316679, at *3. But wait, there's more inconsistency.

In section 6(D), the Governor discusses "Funerals." [D.E. 1-6] 12. Section 6(D) states: "Notwithstanding the above, and in an effort to promote human dignity and limit suffering, Mass Gatherings at funerals are permitted for up to fifty (50) people. People meeting at a funeral should observe the Recommendations to Provide Social Distancing and Reduce Transmission to the extent possible." Id.

At oral argument, the Governor's counsel conceded that there is no public health rationale for allowing 50 people to gather inside at a funeral, but to limit an indoor religious worship service to no more than 10 people. Some funerals are religious. Some funerals are not religious. The Governor's counsel could not explain why the Governor trusts those who run funerals to have 50

14

people inside to attend the funeral, but only trusts religious entities and individuals to have 10 people inside to worship.

Plaintiffs have demonstrated that they are likely to succeed on the merits because the assembly for religious worship provisions in EO 138 and the Guidance place a burden on the plaintiffs' free exercise of religion. See, e.g., Roberts, 2020 WL 2316679, at *2–5. Plaintiffs "just want to be treated equally." Id. at *3. "They don't seek to insulate themselves from [North Carolina's] general public health guidelines." Id. "They simply wish to incorporate them into their worship services" indoors. Id. "They are willing to follow any hygiene requirements." Id. "The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way he trusts accountants, lawyers, and laundromat workers to do the same." Id. "How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings?" Id. Eleven men and women can stand side by side working indoors Monday through Friday at a hospital, at a plant, or at a package distribution center and be trusted to follow social distancing and hygiene guidance, but those same eleven men and women cannot be trusted to do the same when they worship inside together on Saturday or Sunday. "The distinction defies explanation, or at least the Governor has not provided one." Id.

This court does not doubt that the Governor is acting in good faith to lessen the spread of COVID-19 and to protect North Carolinians. "But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." Id. at *4. Moreover, it does not "make a difference that faith-based bigotry did not motivate" EO 138. Id. The Constitution makes the bar higher than that. "The constitutional benchmark is governmental neutrality, not governmental avoidance of bigotry." Id. (emphasis added). "A law is

15

not neutral and generally applicable unless there is neutrality between religion and non-religion." Id. (quotation omitted). "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones." Id. Importantly, "[a]ll laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protects religious observers against unequal treatment." Lukumi, 508 U.S. at 542 (quotation and alteration omitted).

The assembly for religious worship provisions in EO 138 starkly illustrate the extent to which religious entities and individuals are not subject to a neutral or generally applicable law. The record, at this admittedly early stage of the case, reveals that the Governor appears to trust citizens to perform non-religious activities indoors (such as shopping or working or selling merchandise) but does not trust them to do the same when they worship indoors together. Cf. id. at 543. "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." Id. Notably, 15 other Governors trusted the people of their states and exempted religious gatherings from any attendance limitations during this pandemic.[1] The Governor has failed to cite any peer-reviewed study showing that religious interactions in those 15 states have accelerated the spread of COVID-19 in any manner distinguishable from non-religious interactions. Likewise, common sense suggests that religious leaders and worshipers (whether inside or outside North Carolina) have every incentive to behave safely and responsibly whether working

---

[1] These fifteen states are Pennsylvania, West Virginia, Ohio, Michigan, North Dakota, South Dakota, Utah, Colorado, Arizona, Texas, Arkansas, Tennessee, South Carolina, Georgia, and Florida. See [D.E. 3] 12 n.2; Virginia Villa, Most States Have Religious Exemptions to COVID-19 Social Distancing Rules, Pew Research Center (April 27, 2020), https://www.pewresearch.org/fact-tank/2020/04/27/most-states-have-religious-exemptions-to-covid-19-social-distancing-rules/

16

indoors, shopping indoors, or worshiping indoors. The Governor cannot treat religious worship as a world apart from non-religious activities with no good, or more importantly, constitutional, explanation. Accordingly, as in Roberts, the assembly for religious worship provisions in EO 138 must satisfy strict scrutiny and narrow tailoring. See Roberts, 2020 WL 2316679, at *4.

As for strict scrutiny and narrow tailoring, no one contests that the assembly for religious worship provisions in EO 138 "burden sincere faith practice." Id. Similarly, no one contests the Governor's compelling interest in seeking to prevent the spread of COVID-19. Thus, the question becomes whether the assembly for religious worship provisions in EO 138 amount to the "least restrictive means" of serving that compelling interest. Id. They do not. Plaintiffs have pledged to adhere to "all recommended COVID-19 social distancing and personal hygiene safety guidelines" in exercising their free exercise rights. [D.E. 3] 3. They simply want the Governor to afford them the same treatment as they and their fellow non-religious citizens receive when they work at a plant, clean an office, ride a bus, shop at a store, or mourn someone they love at a funeral. See Lukumi, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree."); Roberts, 2020 WL 2316679, at *3–4.

The court recognizes that under Jacobson, the state has significant power to legislate in the public interest during public health emergencies. See Jacobson, 197 U.S. at 29–30. The court acknowledges that the Governor's interest in protecting the public during a public health emergency is both compelling and sincere. The court also understands that "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or the latter to ill health or death." Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944). Moreover, it is not the ambit of the judiciary to "usurp the functions of another branch of government." Jacobson, 197 U.S.

17

at 28. Nevertheless, in <u>Jacobson</u>, the Court recognized that such a power is not absolute and that "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised . . . in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons." <u>Id.</u> In this case, the assembly for religious worship provisions in EO 138 do just that. And, as the Sixth Circuit recently noted, "[w]hile the law may take periodic naps during a pandemic, we will not let it sleep through one." <u>Roberts</u>, 2020 WL 2316679, at *4.

In effect, the assembly for religious worship provisions in EO 138 place worshipers between Scylla and Charybdis, forcing them to choose between obeying their faith or risking criminal prosecution for a Class 2 misdemeanor. <u>See</u> EO 138 [D.E. 1-6] 15; N.C. Gen. Stat. §§ 166A-19.19.30(d), 14-288.20A; <u>Braunfeld v. Brown</u>, 366 U.S. 599, 605 (1961). The Free Exercise Clause of the United States Constitution affords them protection from that choice. The assembly for religious worship provisions in EO 138 are not narrowly tailored to accomplish the compelling interest in protecting public health. Accordingly, plaintiffs have demonstrated they are likely to succeed on the merits of their Free Exercise Claim. <u>See, e.g.</u>, <u>Roberts</u>, 2020 WL 2316679, at *4–5.[2]

### B.

Plaintiffs have demonstrated they would suffer an irreparable injury if the assembly for religious worship provisions in EO 138 are enforced. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976); <u>see</u> <u>Johnson v. Bergland</u>, 586 F.2d 993, 995 (4th Cir.1978) ("Violations of

---

[2] At this stage of the case, the court declines to address plaintiffs' Establishment Clause claim or their Freedom of Assembly claim.

first amendment rights constitute per se irreparable injury."). Moreover, that EO 138 may expire on Friday, May 22, 2020 at 5 PM, offers no comfort to plaintiffs. See [D.E. 1-7] 15. With each passing day, the harm from depriving plaintiffs of their free exercise rights only increases. Accordingly, enforcing the assembly for religious worship provisions in EO 138 constitutes irreparable injury. See, e.g., Stuart Circle Parish v. Bd. of Zoning Appeals of City of Richmond, 946 F. Supp. 1225, 1235 (E.D. Va. 1996).

The court also must balance the equities before granting a temporary restraining order. Here, the temporary restraining order concerns a portion of an executive order of the Governor, and necessarily implicates the public interest. The public has a compelling interest in preventing the spread of COVID-19. Lives are at risk, particularly among the elderly and those with pre-existing conditions such as obesity, diabetes, hypertension, and lung disease. But the instinct for self-survival is strong. The court trusts worshipers and their leaders to look after one another and society while exercising their free exercise rights just as they and their fellow citizens (whether religious or not) do when engaged in non-religious activities. Plaintiffs have pledged to practice social distancing and other public health guidelines, just like others under EO 138. Accordingly, the equities tip in favor of granting a temporary restraining order.

As for the public interest, it favors a temporary restraining order. After all, "[t]reatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves a bedrock free-exercise guarantee." Roberts, 2020 WL 2316679, at *5.

C.

As for the scope of the temporary restraining order, district courts have "broad discretion when fashioning injunctive relief," subject to certain limits. Ostergren v. Cuccinelli, 615 F.3d 263, 288 (4th Cir. 2010). "Once a constitutional violation is found, a federal court is required to tailor

19

the scope of the remedy to fit the nature and extent of the constitutional violation." Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977) (quotation omitted); see Ostergren, 615 F.3d at 288–89. Accordingly, the scope of the injunction is not dictated "by the geographical extent of the plaintiff class." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). Rather, the injunction must be "carefully addressed to the circumstances of the case." Va. Soc'y for Human Life v. FEC, 263 F.3d 379, 393 (4th Cir. 2001), overruled on other grounds by The Real Truth About Abortion, Inc. v. F.E.C., 681 F.3d 544 (4th Cir. 2012); see PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 128 (4th Cir. 2011); Hayes v. N. State Law Enf't Officers Ass'n, 10 F.3d 207, 217 (4th Cir. 1993). Additionally, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Califano, 442 U.S. at 702.

The court exercises its discretion to enjoin enforcement of the assembly for religious worship provisions in EO 138. See Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear, — F. Supp. 3d —, 2020 WL 2305307, at *6 (E.D. Ky. May 8, 2020); see also Rodgers v. Bryant, 942 F.3d 451, 457–60 (8th Cir. 2019); cf. Horne v. Flores, 557 U.S. 433, 470–72 (2009). At the hearing, plaintiffs asked the court to issue a statewide injunction, and the Governor's counsel confirmed that the assembly for religious worship provisions in EO 138 apply to all who assemble for religious worship throughout North Carolina. Moreover, the assembly for religious worship provisions in EO 138, by their terms, prohibit not just Berean Baptist or People's Baptist from holding indoor worship activities with more than ten people, but necessarily prohibit all worshipers in North Carolina from such worship. Stated differently, the scope of the free exercise violation caused by the assembly for religious worship provisions in EO 138 involves every religious activity in North Carolina where more than 10 people gather indoors to worship. See Brinkman, 433 U.S. at 420; Ostergren, 615 F.3d

20

at 288–89. Accordingly, the court issues a statewide injunction.[3]

IV.

In sum, the court GRANTS plaintiffs' emergency motion for a temporary restraining order [D.E. 2]. Defendant, any of his agents, employees, and state or local law enforcement officers are ENJOINED from taking any enforcement action against plaintiffs or any other worshipers pursuant to the assembly for religious worship provisions in EO 138. As set forth in section 6(D) of EO 138, any person or group of people gathering to worship "should observe the Recommendations to Promote Social Distancing and Reduce Transmissions to the extent practicable." [D.E. 1-6] 12. This order shall remain in place for no longer than 14 days. See Fed. R. Civ. P. 65(b)(2). No bond is required.

The court SCHEDULES a hearing on plaintiffs' motion for a preliminary injunction on Friday, May 29, 2020, at 11:00 a.m. in courtroom one of the Terry Sanford Federal Building, 310

---

[3] At the hearing, the Governor's counsel mentioned Ex parte Young, 209 U.S. 123 (1908). In Ex parte Young, the Supreme Court held that a party may seek "prospective, injunctive relief against a state officer to prevent ongoing violations of federal law" if certain requirements are met. McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010); see Ex parte Young, 209 U.S. at 159–60. Specifically, a "special relation" must exist between the state officer sued and the regulation at issue, and the officer has either acted or threatened to act pursuant to the regulation. McBurney, 616 F.3d at 399; see Ex parte Young, 209 U.S. at 155–57; Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001). A "special relation" exists if the officer has "proximity to and responsibility for the challenged state action." S.C. Wildlife Fed'n v. Limehouse, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis in original). In contrast, a state officer's "[g]eneral authority to enforce the laws of the state" is not a "special relation." Gilmore, 252 F.3d at 331; see Limehouse, 549 F.3d at 333.

Obviously, the Governor issued EO 138, and his office issued the "Guidance for Religious Services and Mass Gathering Restrictions." See [D.E. 1-6, 1-7]. The court need not delve further into Ex parte Young at this time. As discussed, plaintiffs demonstrated that they are likely to succeed on the merits of the Free Exercise claim, and Ex parte Young does nothing to disturb the analysis. Moreover, to the extent that the plaintiffs did not plead the proper defendants under Ex parte Young, plaintiffs promptly may amend their complaint as of right to add defendants. See Fed. R. Civ. P. 15. At the appropriate time and with the benefit of briefing and a more fully developed record, the court may again address the issue.

21

New Bern Avenue, Raleigh, North Carolina. Plaintiffs' brief in support of their motion for a

preliminary injunction is due on Thursday, May 21, 2020. Defendant's response is due on Tuesday,

May 26, 2020. Plaintiffs' reply is due on Wednesday, May 27, 2020. If EO 138 expires, the parties

shall promptly notify the court.

SO ORDERED. This 16 day of May 2020, at 2:15 p.m.


JAMES C. DEVER III
United States District Judge